OAKMAN *v.* RECORDER OF THE CITY OF DETROIT.

CRIMINAL LAW—PRESENTMENT—GRAND JURY—SECRECY — RECORDER'S COURT OF DETROIT.

> Where the recorder of the city of Detroit conducted an investigation for the discovery of crime under authority of Act No. 196, Pub. Acts 1917, he was exercising functions analogous to those of grand juries, upon whom secrecy is enjoined by 3 Comp. Laws 1915, §. 15703, and his act in making his findings in a so-called "presentment" part of the official records of his court was therefore illegal, and the issuance of warrants out of his court some time later charging the president of the board of water commissioners with the commission of various offenses recited in said "presentment" would not validate his unwarranted act.

Mandamus by Robert Oakman to compel Charles T. Wilkins, recorder of the city of Detroit, to strike a

certain document from the files of the recorder's court. Submitted January 14, 1919. (Calendar No. 28,283.) Writ granted July 17, 1919.

*Barnard & VanDeMark,* for plaintiff.

*Edwin Henderson,* for defendant.

This is an application for a writ of mandamus to require the respondent to strike from the files of the recorder's court of the city of Detroit a certain document designated as a "presentment" and to expunge from the records of said recorder's court all references to said so-called presentment, in the proceedings of said court. The paper, the subject of the application, is self-explanatory and is as follows:

"(Filed October 8, 1917.)
"John A. Grogan, Clerk.
"Presentment to the recorder's court of the city of Detroit, by William F. Connolly, recorder of the city of Detroit, holding an inquisition into undiscovered and unpunished crime in the city of Detroit, under and by virtue of Act No. 196 of the Public Acts of 1917, being an 'Act to authorize proceedings for the discovery of crime and to provide penalties for the violation of such procedure.'.
"Foreword.
"This inquiry has been directed, in part, to the conduct of the water board, with particular reference to the building of extensions of water mains and service lines. It is in testimony that any person desiring to have a service line laid in a street where there are no houses, must first deposit in cash with the water board, a bonus equal to fifteen per cent. of the estimated cost of laying a six-inch pipe. This, until recently, has been the uniform and unbroken rule and practice of the water board.
"It is in testimony that Robert Oakman, a real estate dealer in the city of Detroit, is president of the board of water commissioners. Further, that he has filed a large number of applications for the laying of

service pipe lines in subdivisions of which he is the owner. An investigation of the records of the water board, discloses that contrary to the uniform practice and rule of the water board, he does not, in every instance, pay in advance the fifteen per cent. bonus required. On the contrary, that he keeps an open account with the water board, for the bonuses which he should pay. On the pipe laid by the water board upon Mr. Oakman's applications, it is estimated that he ought to have paid the water board $15,564.10, and that he has actually paid the board about $9,200, leaving an unpaid balance of approximately $6,000. Pipes for which these bonuses should have been paid in advance, have almost entirely been laid by the board of water commissioners.

"The laying of water pipes in streets whereon no houses are built, is a matter of great expense to the board of water commissioners, and the rate payers of the city of Detroit, whom that board represents. Where there are no houses upon such streets, the board can derive no revenue from the sale of water through the use of these pipes. Naturally, it is questionable business policy, when pipe is up to $60 a ton, to lay pipes which will not be revenue producing, even though the 15 per cent bonus were paid, because the other 85 per cent must come out of the funds of the water board. The situation is aggravated, of course, when, as in the case of Commissioner Oakman, even the 15 per cent bonus is not paid in full, where there are no houses to be a source of revenue for the board from the use of such pipes.

"It is in evidence further that a 36-inch feed main and a 6-inch service pipe were laid on the Ford Highway, from Twelfth street to Linwood avenue, a distance of approximately one-half mile, without an order of the board of water commissioners, and that as to the 6-inch service line, no application for the laying of the same was ever made, and no bonus ever estimated or paid. It is in evidence further that on Burlingame avenue, west of Twelfth street, over 1,400 feet of 8-inch service pipe have been laid without any application for the same, without any estimate or payment

207—Mich.—2.

of a bonus, and without any order or even record of the laying of such pipe.

"When no application is made for the laying of service pipe, of course no estimate of the bonus can be had, and, therefore, no payment of bonus can be exacted by the fiscal department of the board. Hence, in the cases above cited, there being no application made, and the pipe in question being laid by the general manager without the bonus being estimated, it could not be charged against the open account which it is claimed Commissioner Oakman has ordered to be kept with himself on the water board's ledger.

"It is also in evidence that about two years ago, one R. D. Baker, upon the order of Robert Oakman, opened a 'blow-off' in a water main of the board of water commissioners of the city of Detroit, at Otsego avenue and the city line, installed a three-inch meter thereon, and attached thereto a galvanized iron pipe which furnished water to two streets outside of the city limits in one of the Oakman subdivisions. It is further in evidence that no record was ever made in any department of the water board as to this transaction, and that it was discovered by accident. At the time it was discovered, the meter had been working for something like a year. It was what is known as a million meter, that is to say, that it would automatically turn back and start over its recording when the million foot point was reached. By order of one of the commissioners, the secretary billed Commissioner Oakman for the amount of water recorded upon the said meter, and subsequently, by order of the same commissioner, presented the bill to Commissioner Oakman at a meeting of the board. The bill for this water has never been paid.

"It is further in testimony that much confusion and controversy has arisen in the keeping of the accounts of the board with the American Car & Foundry Company, its contractors for iron pipe, by reason of the fact that General Manager Leisen ordered the diverting of a large quantity of water board pipe from the use of the board to the use of Commissioner Oakman in one of his real estate operations. The water board had a favorable contract, at $29 per ton, for this pipe. At a time when the market price was considerably

higher, and the smaller sizes of pipe practically unobtainable, it was unprofitable for the water board to supply outsiders with pipe from its favorable contract, because as soon as the quantity purchased upon the contract was delivered, the board was compelled to enter into a new contract at an advanced price. Nevertheless, this was done, and there still exists a foggy controversy as to whether some of this pipe should be paid for by the water board or by Commissioner Oakman, the representatives of the contracting company billing the same, and demanding pay from the water board for this pipe.

"It is superfluous to comment upon these relations of the president of the water board with the activities of his board. Also it is superfluous to suggest that wide stretches of plow land, even though subdivided, do not, from the viewpoint of public service, require the adornment of miles of water mains, varying in size from 16 to 36 inches, when future commitments of the water board for pipe supply will have to be made on a basis of $60 per ton.

(Signed)  "W. F. CONNOLLY."

It was filed on October 8, 1917, and immediately became public. On October 17, 1917, counsel for petitioner made an application to the recorder's court for an order to strike said so-called "presentment" from the files. On January 7, 1918, two several warrants were issued out of the recorder's court for the city of Detroit against the petitioner wherein said petitioner stands charged with the commission of certain offenses, some of which are mentioned in the so-called "presentment," but others of which are not. On the following day, January 8, 1918, the court denied the order to strike, saying:

"It appearing by the files and records of this court, that the said statement constituting an informal complaint and finding of probable cause against the said Robert Oakman is now superseded by and merged in a formal complaint and warrant filed in and issued out of this court, on January 7, 1918, charging said Robert

Oakman with wilful neglect of duty, enjoined by law as a public officer, and covering the matters set forth in said formal complaint and more, the court holds that said motion to expunge involves only a moot question.

"Read, corrected and signed in open court.

"W. F. CONNOLLY,

(Seal.)          "Recorder of the city of Detroit."

On the 28th day of January, 1918, an order to show cause issued out of this court directed to the recorder of the recorder's court of the city of Detroit. In the meantime and on January 9, 1918, Hon. William F. Connolly had ceased to be recorder and Hon. Charles T. Wilkins had succeeded him in said office. The return to said order to show cause is in part as follows:

"I do further return that for a considerable period of time before the filing of the paper writing referred to in the petition herein and denominated 'presentment' the said William F. Connolly, then being a judge of a court of record, to wit: Recorder of the city of Detroit, presiding over the recorder's court in said city, upon filing of a complaint with him, as such official, and having probable cause to suspect that crimes had been committed within his jurisdiction and that certain persons might be able to give material evidence respecting such offenses, acting by the authority of law and particularly under the authority of Act No. 196 of the Public Acts of 1917, did require the attendance before him of divers persons as witnesses and did take certain testimony concerning the alleged commission of crimes within his jurisdiction. That upon and as a result of such inquiry, the said William F. Connolly, as such judge, being satisfied that certain crimes had been committed and that there was probable cause to suspect said Robert Oakman to have been guilty of the commission thereof, thereupon made his findings in the premises, and that the said crimes had been committed and that there was probable cause to suspect the said Robert Oakman of having been guilty thereof, and for the purpose of causing the apprehension of the said Robert Oakman by proper process to answer for such crimes, said William F. Connolly, acting in his

judicial capacity aforesaid, made and filed the paper writing referred to in said petition and called therein a 'presentment,' and thereafter, by means of and by use of the said presentment and findings of fact, and as the result of the taking of the testimony aforesaid in the investigation aforesaid, warrants charging the crimes therein found recorded and stated, were prepared and issued, and the said Robert Oakman was thereafter apprehended by the said warrants of the said recorder, William F. Connolly, charging the crimes aforesaid against the said Oakman, and based upon said findings as stated in said presentment, and held to answer therefor, as provided by law. That said Oakman was duly arraigned upon said warrants and on a plea of not guilty, let to bail therein; which proceedings and warrants and charges of crime at the date of this return are still pending against said Oakman and are yet undetermined before this respondent. Copies of said warrants are hereto attached and made a part of this return, and marked Exhibits B and C."

STEERE, J. (*after stating the facts*).    Act No. 196 of the Public Acts of 1917 is entitled:

"An act to authorize proceedings for the discovery of crime, and to provide penalties for a violation of such procedure."

Sections 1 and 2 of said act are as follows:

"Whenever by reason of the filing of any complaint which may be upon information and belief, any justice of the peace, police justice or judge of a court of record shall have probable cause to suspect that any crime, offense, misdemeanor or violation of any city ordinance, shall have been committed within his jurisdiction, and that any person may be able to give any material evidence respecting such offense, such justice or judge in his discretion may, and upon the application of the prosecuting attorney, or city attorney in the case of suspected violation of ordinances, shall require such person to attend before him as a witness and answer such questions as such justice or judge may require concerning any violation of law about which he may be questioned; and the proceedings to summon

such witness and to compel him to testify shall, as far as possible, be the same as proceedings to summon witnesses and compel their attendance and testimony, and such witnesses shall be entitled to the same compensation as in other criminal proceedings.

"If upon such inquiry the justice or judge shall be satisfied that any offense has been committed and that there is probable cause to suspect any person or persons to be guilty thereof, he may cause the apprehension of such person or persons by proper process, and, upon the return of such process served or executed, the justice or judge shall proceed with the case, matter or proceeding in like manner as upon formal complaint, and in respect of communicating ‘ or divulging any statement made by such witnesses during the course of such inquiry, the justice, judge, prosecuting attorney and other person or persons who may, at the discretion of such justice, be admitted to such inquiry, shall be governed by the provisions of law relative to grand jurors."

Sections 3 and 4 provide for the punishment of recalcitrant witnesses and under certain circumstances for immunity of witnesses compelled to give incriminating testimony. It is the contention of the relator that the closing words of section 2,—

"and in respect of communicating or divulging any statement made by such witnesses during the course of such inquiry the justice, judge, prosecuting attorney, etc.   *   *   *   shall be governed by the provisions of the law relative to grand jurors,"

—were intended by the legislature to operate as a limitation upon the power of the conservator of the peace and to enforce secrecy on the part of the officer making the investigation in the same manner as secrecy is enjoined upon grand jurors in the course of their investigation. The oath of a grand juror set forth in section 15703, 3 Comp. Laws 1915, provides in part:

"your own counsel, and the counsel of the people and of your fellows you shall keep secret."

Section 15713 follows:

"No grand juror or officer of the court shall disclose the fact that any indictment for a felony has been found against any person not in custody or under recognizance, otherwise than by issuing or executing process on such indictment, until such person has been arrested."

Assuming, as was apparently assumed by the recorder, that in making the investigation he was exercising functions analogous to those of a grand jury, it is the contention of relator that the so-called "presentment" filed by him should, upon application, have been expunged from the records under the authority of *Bennett* v. *Kalamazoo Circuit Judge,* 183 Mich. 200. A comprehensive review of the authorities touching the matter of presentments and indictments by grand juries will be found in that case and need not here be repeated.

It is, we think, clear, that the respondent, acting either as a conservator of the peace or in the exercise of powers analogous to those possessed by grand juries, was without power to make his so-called "presentment" a part of the official records of his court. On behalf of the respondent it is urged that the fact that some three months later warrants were issued out of his court formally charging the petitioner with the commission of various offenses recited in the so-called "presentment" is sufficient to distinguish the case at bar from *Bennett* v. *Kalamazoo Circuit Judge, supra.* This argument is not without force, but in the light of the reasoning of the decisions digested in that opinion we believe that the subsequent, though tardy, issuance of the warrants does not validate an act which at the time of its performance was unwarranted. It is quite true, as contended on behalf of the respondent, that the subsequent issuance of the warrants has made public in a legal way the matter contained in the

"presentment," but we are unable to see how this fact should affect the determination of a naked legal question.

The mandamus will issue as prayed.

Bird, C. J., and Moore, Brooke, Fellows, Stone, and Kuhn, JJ., concurred. Ostrander, J., did not sit.